

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00393-CV

**IN THE INTEREST OF B.M.D.B.**, J.J.B., K.M.B., and V.D.C.

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-01408
Honorable Richard Garcia, Associate Judge Presiding

Opinion by:      Luz Elena D. Chapa, Justice

Sitting:         Karen Angelini, Justice
                 Rebeca C. Martinez, Justice
                 Luz Elena D. Chapa, Justice

Delivered and Filed:  December 9, 2015

AFFIRMED IN PART; REVERSED AND RENDERED IN PART

Jane appeals the trial court's termination of her parental rights to her four children, B.M.D.B., J.J.B., K.M.B., and V.D.C.[1] She argues there is legally and factually insufficient evidence to support the trial court's findings of grounds for termination and that termination is in the children's best interest. We reverse the trial court's termination of Jane's parental rights and render judgment denying the Department of Family and Protective Services' request to terminate Jane's parental rights. We affirm the remainder of the trial court's judgment.

---

[1] To protect the identity of the minor children, we refer to the children's parents and relatives by either using their first names or pseudonyms and to the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).

BACKGROUND

In June 2014, the Department of Family and Protective Services filed a petition for termination of Jane's parental rights and for conservatorship of the children. The case proceeded to a bench trial on April 20, 2015, and Jane and the father of B.M.D.B., J.J.B., and K.M.B. appeared through counsel, but were not present. The trial court proceeded over Jane's attorney's announcement of "not ready."

Three witnesses testified for the Department. Johnny testified he was V.D.C.'s father and V.D.C. had been living with him for the ten months prior to trial. He stated that until recently, his mother was the primary decision maker for V.D.C. but "everything is going great" and V.D.C. was doing very well in school. Johnny stated he would continue providing for V.D.C. to the best of his ability. He agreed "[t]o the fullest" that Jane's parental rights to V.D.C. should be terminated, but he did not provide a reason.

Rachel Grier, the CPS caseworker from January 2015 until the time of trial, agreed Johnny should be named V.D.C.'s managing conservator. She testified Jane "was given a service plan" but did not complete it. Grier stated Jane completed "[a] parenting course, and then several courses that weren't on her family plan." She also stated Jane "had drug issues and she abandoned the children." When asked whether she had made "attempts to try to communicate with [Jane]," Grier responded, "No." When asked whether she had any communication with Jane while she was assigned to the case, Grier responded, "No." Grier explained that Jane was incarcerated and that she called TDCJ twice to get Jane's information. Grier stated, however, that the Department received two letters from Jane during her incarceration, and one letter was addressed to the caseworker who had previously been assigned to the case and the other letter was addressed to Grier. Grier could not recall the dates when Jane wrote to the Department. Grier testified that she believed Jane was not allowed visitation with the children because she was incarcerated.

The Department then asked for a "recess" to "make some efforts to get ahold of the mother in this case." Six weeks later, trial resumed and Jane's counsel again announced "not ready." The trial proceeded and the Department called Grier to continue testifying.

Grier testified Jane was "picked up on a parole violation" on May 21, 2014, and released from TDCJ on April 1, 2015. During the recess, Grier sent Jane a text message and visited her last known address, which Grier received from Jane's parole officer. Grier stated she did not have any telephone conversations with Jane, but Grier did call and leave messages. Grier testified Jane called her back from a friend's home phone and stated her friend's number was not a good contact number to reach her, and she would call Grier back in an hour, but did not. Grier testified Jane's friend confirmed the number at which Grier was sending text messages to Jane was a good number to text her, but stated Jane was unable to send text messages from Jane's phone. Grier confirmed Jane "always had a good number to . . . reach someone at the Department."

Grier stated she did not inform Jane that the Department wanted to place V.D.C. with Johnny. When asked, "[D]o you have any information on whether or not [Jane] can care for her children?" Grier responded, "I do not have any new information on [Jane]." Grier also stated she had no information about Jane's parenting ability and believed Jane did not understand her children's needs but admitted "I don't have information to prove that." When asked whether Grier had any information about whether Jane could financially support her children, Grier responded, "No, I don't."

Grier testified she believed termination of Jane's parental rights was in the children's best interest. She explained the basis for her opinion was that "[Jane] did not offer her children a stable and safe environment," "the children . . . described some of that time and it was very stressful for them. [Jane has] not demonstrated in the past that she can be an appropriate mother to her children." When asked about why the time was stressful for the children, Grier responded, "Drug

use, violence in the home, instability, just the general neighborhood," but gave no details. She explained that in January, when she was assigned to this case, the children were "still talking about all those things" and her "impression" was that, prior to living with Johnny's sister, Brandy, the children "were exposed long-term to those things." Grier also stated Jane made "zero efforts" to contact the Department despite having the Department's information, and "we have reached out to her to even see her children."

Grier further testified the Department's plans were to place the three older children with Brandy. When asked whether Brandy had shown and demonstrated she can meet all of the children's basic needs and had shown a long-term commitment to the children, Grier stated, "Yes." However, Grier also stated that Brandy indicated she "could not financially support [the children], that she was . . . struggling." Grier testified B.M.D.B. and V.D.C. were "doing really well," and that all of the children "thrived" in their current location and were either doing well academically or going to pass their current grade levels. Grier further testified Brandy told her Jane "had done absolutely nothing to financially support these children."

On cross-examination, Grier admitted she made no attempt to contact Jane when Jane was in prison and when asked why she made no attempt to contact her, Grier stated, "I don't have a good answer for that. I just didn't." She stated the first time she attempted to contact Jane was after trial had started. Grier also acknowledged she was aware Jane was prohibited by court order from having visits with the children until further order from the court. Grier stated she attempted to call Jane at Jane's number "on an earlier date," and that she texted Jane a "brief synopsis of her service plan." Grier admitted that both Johnny and Brandy "had some financial struggles throughout this case." When asked why, given Johnny's and Brandy's financial struggles, it was not in the children's best interest to require Jane to pay child support while the children were in Johnny and Brandy's care, Grier responded, "I don't know that she would follow through and -- I don't know."

A CASA advocate for the children testified Jane's rights should be terminated, stating, "It was my impression that [Jane] just dropped the children off at [Brandy]'s house and left them." The CASA advocate stated that in her single conversation with the children, they did not mention any domestic violence or drug use. When asked whether the CASA advocate ever talked to the children about her mother, she stated she had one conversation about Jane, and B.M.D.B. stated she missed her mom. The CASA advocate testified she observed the children with Brandy and concluded they love each other. She also testified the children were initially struggling when removed from their mother, but when under Brandy's care, they were doing much better. The CASA advocate stated Brandy went to parent-teacher meetings and "she's done everything for [B.M.D.B., J.J.B., and K.M.B.] that she has done for her own three." When asked whether she knew whether Jane "would be able to do that," she responded, "I don't know."

The CASA advocate also admitted to making no efforts to contact Jane. She stated, "I don't know what [Jane's'] financial ability is, so I don't know what kind of support she would be able to give anybody."

The trial court awarded the Department managing conservatorship of B.M.D.B., J.J.B., and K.M.B, and Johnny C. managing conservatorship of V.D.C. The trial court also terminated Jane's rights to all four children. Jane appeals only the termination of her parental rights.

## STANDARD OF REVIEW

Judgments terminating parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (West 2014). To determine if this heightened burden of proof was met, we employ a heightened standard of review—judging whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role.

*Id.* at 26. We are not to reweigh issues of witness credibility but "must defer to the [factfinder's] determinations so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

Legal sufficiency review requires us to examine the evidence "in the light most favorable to the finding." *In re J.F.B.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* But we may not simply disregard undisputed facts that do not support the finding; to do so would not comport with the State's heightened burden of proof by clear and convincing evidence. *Id.* "A lack of evidence does not constitute clear and convincing evidence." *In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012). Conclusory testimony, even if uncontradicted, is not clear and convincing evidence that supports a best-interest finding. *See In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.).

When conducting a factual sufficiency review, we evaluate "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.B.*, 96 S.W.3d at 266. We hold the evidence to be factually insufficient only if, in the light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *Id.*

#### CHILDREN'S BEST INTEREST

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re E.W.*, — S.W.3d —, No. 06-15-00018-CV, 2015 WL 3918292, at \*9 (Tex. App.— Texarkana June 26, 2015, no pet.). There must be "the most solid and substantial reasons"

justifying termination. *See id.* The best-interest determination is a wide-ranging inquiry, and the Texas Supreme Court has set out some factors relevant to the determination:

- the desires of the child;
- the emotional and physical needs of the child now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;
- the programs available to assist these individuals to promote the best interest of the child;
- the plans for the child by these individuals or by the agency seeking custody;
- the stability of the home or proposed placement;
- the acts or omissions of the parent which may indicate that the existing parent-child relationship is a proper one; and
- any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The list is not exhaustive, and not every factor must be proved to find that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. Evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *Id.* "Evidence that the parent has committed the acts or omissions prescribed by section 161.001 may also be probative in determining the child's best interest; but the mere fact that an act or omission occurred in the past does not *ipso facto* prove that termination is currently in the child's best interest." *In re O.N.H.*, 401 S.W.3d at 684 (internal citation omitted). However, a factfinder may measure a parent's future conduct by his or her past conduct in making the best-interest determination. *Id.*

The Department presented no evidence about the children's desires and no evidence about the children's physical or emotional needs. The lack of evidence regarding these factors means they do not weigh in favor of termination. *See In re E.N.C.*, 384 S.W.3d at 808.

The only evidence about Jane's parental ability was Grier's testimony that she had no information about Jane's parenting ability, but believed Jane did not understand her children's

needs. Nevertheless, Grier admitted she did not "have information to prove that." Grier's testimony is conclusory and was admittedly not based on any evidence. Thus, the lack of evidence regarding this factor means the factor does not weigh in favor of termination. *See id.*

The Department sought to place B.M.D.B., J.J.B., and K.M.B. with Brandy. Grier testified the children were "doing really well" in Brandy's and Johnny's care, but this too is conclusory evidence. *See In re E.N.C.*, 384 S.W.3d at 808; *In re A.H.*, 414 S.W.3d at 807. Grier also testified the children would pass their grade levels and their basic needs were being met, but acknowledged Brandy expressed that she could not financially support B.M.D.B., J.J.B., and K.M.B., in addition to her own three children. The record is devoid of any evidence of Jane's financial situation or her potential ability to pay child support to assist Brandy if Jane's parental rights were not terminated.

There was evidence that Jane left her children with Brandy for several weeks, but the record is silent as to the circumstances surrounding Jane's decision to do so. There was evidence that Jane was "picked up" for violating a condition of her parole and was incarcerated for less than a year for an offense Grier "believed" was related to organized crime, but the record is also silent as to the circumstances of Jane's parole violation and the nature and severity of her offense.

There was evidence that Jane did not contact the Department after she was no longer incarcerated, and Jane also did not show up for either day of trial. To the extent these facts weigh in favor of the best-interest finding, there was also evidence that Jane wrote letters to the Department while she was incarcerated, Grier made no attempt to contact Jane before trial had started, and there was no evidence that the prior caseworker had made any attempt to respond to Jane's letter. When asked why she did not contact Jane, Grier stated, "I don't have a good answer for that. I just didn't."

The Department argues Jane did not attempt to see her children after she was released from prison. However, Grier admitted Jane was prohibited by court order from visiting her children, and Grier did not have any contact with Jane until after trial had started.

The Department argues the evidence shows the children were "trapped in a home of violence and drug abuse, causing them trauma for months to come." The only evidence of this was Grier's testimony that there was "[d]rug use [and] violence in the home" and Jane had "drug issues." However, Grier gave no details about Jane's "drug issues" or the "violence in the home." Grier did not testify whether the children were present during the violence, whether Jane was involved in the violence in the home and if she was, whether she was the victim or the perpetrator, and if she was not present, whether she had reason to know about the violence. These conclusory and general allegations are "legally insufficient to support a best-interest finding in the first place." *See In re E.N.C.*, 384 S.W.3d at 808; *In re A.H.*, 414 S.W.3d at 807.

## CONCLUSION

There are some facts that weigh in favor of the best-interest finding supporting termination of Jane's parental rights. For example, there was evidence that the children were thriving in their placement with Brandy and they were passing their grade levels. There was also evidence that Jane did not attend trial or contact the Department between the first and second day of trial and had engaged in some criminal conduct. However, there was no evidence about the nature or severity of that criminal conduct, and there was no evidence of most of the *Holley* factors. There was no evidence that Jane endangered her children's safety. The Department planned to keep the children with Brandy, who could not financially support the children. On this record, because the Department did not present "the most solid and substantial reasons" justifying termination, we cannot say a reasonable trier of fact could have formed a firm belief or conviction that termination of Jane's parental rights was in the children's best interest. *In re E.W.*, 2015 WL 3918292, at *9;

*accord In re C.H.*, 89 S.W.3d at 25. We hold there was legally insufficient evidence supporting the trial court's best-interest finding. Because legally insufficient evidence supports the trial court's best-interest finding, we reverse the trial court's judgment and render judgment denying the Department's request to terminate Jane's parental rights. *In re J.E.H.*, No. 04-12-00110-CV, 2012 WL 4579296, at *5 (Tex. App.—San Antonio Oct.3, 2012, no pet.) (mem. op.).[2] However, Jane has not challenged the trial court's orders regarding managing conservatorship of the children. Thus, the remainder of the trial court's judgment is affirmed.

Luz Elena D. Chapa, Justice

---

[2] Based on our conclusion as to the best-interest finding, we need not consider Jane's factual insufficiency issue or her issues regarding the trial court's findings of grounds for termination. *See* TEX. R. APP. P. 47.1.